IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KYLE ANGIER,

              Plaintiff,

    vs.

FRANK BISIGNANO, Commissioner of
Social Security;

              Defendant.

**8:25CV418**

**MEMORANDUM AND ORDER**

This matter comes before the Court on Plaintiff's, Kyle Angier's, motion for an order reversing the Commissioner of Social Security's decision denying Angier disability benefits. Filing No. 8. The Defendant, Frank Bisignano, responded with a motion for an order affirming the decision. Filing No. 10. For the reasons detailed herein, the Court does not believe the Administrative Law Judge's ("ALJ's") decision was founded on substantial evidence. As such, the Court grants the plaintiff's motion, denies the defendant's motion, reverses the decision of the Commissioner, and remands the case for an award of disability benefits.

## I.  BACKGROUND

### A. Medical History

Kyle Angier suffers from several medical impairments, including a diagnosis of bipolar disorder dating back to at least 2008. Filing No. 5-3 at 10. When he was younger, he received electroconvulsive therapy for his bipolar disorder and depression. Filing No. 6-1 at 182. He also had two suicide attempts by overdose and was hospitalized each

1

time.  *Id.* at 188.  Notwithstanding these mental health issues, he was able to make a career as a construction supervisor and a foreman.  Filing No. 5-6 at 19.

In 2017, Angier was working as a glazer installing a pane of glass at a construction site when he felt a pop in his back.  Filing No. 5-7 at 75.  This forced him to quit his construction career.  Filing No. 5-6 at 19 (noting his end date as a glazer after only a month or two in 2017).  The injury began a lengthy history of back pain and attempted treatments for degenerative disc disease.  Filing No. 5-7 at 155 (diagnosis).  An MRI at the time showed two disc extrusions transiting the L4 and L5 nerves, but an electromyograph was negative for neuropathy.  *Id.* at 159–60 (MRI); *Id.* at 164–65 (EMG).  Angier described the pain as excruciating and radiating down his left leg.  *Id.* at 158.  It was severe enough to overcome Angier's strong opposition to using opiates, possibly on account of his previous dependency.  *Id.* at 158 (opposition); *id.* at 160 (dependence); *id.* at 181 (starting MS Contin).

Over the course of 2019, Angier received a left sacroiliac joint injection, trigger point injections, several left lumbar medial branch injections, and radiofrequency ablation, none of which provided lasting relief.  Filing No. 5-7 at 173–74 (sacroiliac joint injection); *id.* at 184–85 (trigger point injections); *id.* at 192–93 (first medial branch injection); *id.* at 201–02 (second medial branch injection); *id.* at 206–07 (third medial branch injection); *id.* at 216–17 (fourth medial branch injection and radiofrequency ablation).  During this time, Angier worked briefly delivering food for DoorDash, but he testified that getting into and out of a car was too painful.  Filing No. 5-2 at 41.

Angier's insurance declined to pay for a spinal cord stimulator without first trying surgery, so he went in for his first diskectomy with Dr. Jonathan Fuller on May 20, 2020.

2

Filing No. 5-7 at 178 (insurance denial); *id.* at 54 (first surgery). This was the date Angier alleges he became disabled. Filing No. 5-6 at 83. Following his surgery, Angier reported his back pain was better but still constant, ranging from a three to a seven on a one-to-ten scale. Filing No. 5-7 at 42. His leg pain substantially improved, but leg raises were limited on both sides by pain or stiffness. *Id.* at 49. Two months after the surgery, the pain in his back worsened. *Id.* at 46.

At the same time, his bipolar symptoms began to worsen, leading to his first visit with a new therapist, Peter Cusumano, at CHI Health. Filing No. 6-1 at 180. Cusumano recorded that Angier had moderate depression and was bothered nearly every day by anxiety and irritability. *Id.* He noted that Angier had a dysphoric mood and an irritable affect, some impairment of his immediate memory and attention, mood swings, and sleeping difficulties. *Id.* at 183–86. He also noted that Angier had been back to work in construction for the two weeks prior, although this does not appear to be a successful long-term return to work. *Id.* at 181; Filing No. 5-2 at 13 (finding brief attempts to return to work during the evaluation period were not successful). Angier also complained of ongoing back pain, but Cusumano observed a steady gait. Filing No. 6-1 at 184–85. Angier shared that a significant life event was the death of his grandfather, but he denied being the victim of any abuse as a child. *Id.* at 181.

After that first visit with Cusumano, Angier's reported that his mood was stabilized, and his anger was better managed. *Id.* at 201. However, around the same time, he scratched his right hand open from anxiety, and it became infected. *Id.* at 188.

Angier's back worsened early in 2021 after moving a box of Christmas decorations. Filing No. 5-7 at 81. At that time, he was prescribed Medrol Dosepak, Flexeril, and

Percocet, and told if the pain got any worse, he should go to the emergency room. *Id.* at 86. He then followed up with Dr. Fuller a week later and reported constant pain ranging from four to nine on the one-to-ten scale in both his back and left leg, with only slight relief. *Id.* at 30. He only performed a modified version of the straight leg raise test, which was negative as he was sitting, and his back showed a 10-degree range of motion with pain throughout. *Id.* at 33. Dr. Fuller referred him to physical therapy. *Id.* at 35.

In the following months, Angier reported to Cusumano that he was having trouble sleeping every night and that he was irritable and depressed most of the day for twenty of the past thirty days. Filing No. 6-1 at 205. His Daily Living Activities Score ("DLA") was 99, indicating moderate impairment. *Id.* at 203. Angier indicated he was helping to take care of his children, although he did not specify exactly what this entailed. *Id.* at 207. He was calm and cooperative in his sessions. *Id.* Meanwhile, however, his back pain was constant and relieved by nothing, and his gait was recorded as extremely antalgic. *Id.* at 37–39.

On April 22, 2021, Angier went back to the emergency room after aggravating his back attempting to lift a cement landscaping block. Filing No. 6-1 at 73. This time, the pain affected his back and his right leg. *Id.* He exhibited normal behavior and range of motion, but he was given Toradol, Norflex, and Dilaudid injections for his pain and referred back to Dr. Fuller. *Id.* at 78. New x-rays ordered in May 2021 found anterior spondylosis at L4-5, a disc extrusion abutting the left L5 nerve, severe spinal canal stenosis at L3-4, and mild right and moderate left foraminal stenosis at L4-5. *Id.* at 325–26. In the following weeks, Angier was using a cane and had a positive straight leg raise on the left. *Id.* at 33 (cane); *id.* at 26 (positive left straight leg raise). Dr. Fuller identified a large central disc

4

herniation at L3-4 and a residual left-sided herniation at L4-5 and recommended a second surgery. *Id.* at 27. So, on July 12, 2021, Angier had his second diskectomy. *Id.* at 23.

A month after his surgery, Angier reported pain rated five or six in his lower back and a deep ache in his legs with no good explanation. Filing No. 6-1 at 11, 15. The pain worsened when he walked more than four blocks, bent, lifted, or twisted his back. *Id.* at 11. Angier also reported depression and sleep disturbances. *Id.* at 13. Shortly after, Cusumano reported that Angier's DLA improved to 101, indicating only mild impairment. *Id.* at 209–11. However, he continued to have significant anxiety, although his hand had healed and he was no longer scratching it. *Id.* at 211. Another mental health provider, Praveen Fernandes, indicated that his bipolar disorder was controlled by medication and his mood was stable and not affecting his daily activities, but he was not sleeping because of the pain in his back. *Id.* at 212–13. In November 2021, Angier consulted Dr. Tyrus Soares with the CHI Bergan Pain Medicine Clinic and reported that the pain continued to be severe. *Id.* at 255. Dr. Soares formally diagnosed Angier with failed back surgical syndrome but noted that he had a normal gait, normal mood and judgment, and was alert and oriented. *Id.* at 255–57. He recommended revisiting the idea of a spinal cord stimulator. *Id.* at 258.

Also in November 2021, Angier saw Advanced Practice Registered Nurse John Ramsey at CHI Health Lakeside Psychiatric Associates and reported moderately worse symptoms, specifically depression and nightmares. Filing No. 6-1 at 222. Ramsey attributed the decline to Angier's revelation of childhood sexual abuse by his maternal grandfather when he was nine, which he had "finally" discussed with his wife and father. *Id.* at 225. Ramsey prescribed prazosin to combat the nightmares. *Id.* In December,

Angier began to discuss the abuse with Cusumano without going into detail, but his DLA score had improved to 104. *Id.* at 229, 231.

On December 7 and 11, 2021, Angier went back to the ER with back pain severe enough that he could not walk. Filing No. 6-1 at 10. The Lakeside ER conducted an MRI which showed a large, extruded disc fragment at L4-5 on the left, compressing the left nerve root, along with a left pars defect at L5. *Id.* at 52–53. Angier told Dr. Fuller three days later that he was only comfortable lying down and said he "cannot live like this." *Id.* at 10. He told Dr. Fuller he was also experiencing anxiety, depression, and sleep disturbances. *Id.* at 7. On a December 17 visit, Angier said his feet were "on fire" with sharp, stabbing pain. *Id.* at 87. He walked with an antalgic gait on the left side and x-rays showed collapse at L3-4 and L4-5. *Id.* at 87–88. Four days later, Dr. Soares reported that Angier had a normal gait, while Ramsey described his gait as slow on December 27. *Id.* at 234 (Ramsey); *id.* at 260 (Soares). Ramsey recorded Angier's blood pressure as dramatically higher and reported he continued to have nightmares and back pain, but his concentration, focus, memory, and insight were all good. *Id.* at 232–34.

With further surgery not recommended and pain medications ineffective, Dr. Soares recommended Angier pursue a spinal cord stimulator implant. Filing No. 6-1 at 263. At that time, Angier rated his pain as nine out of ten and described it as intolerable and worsened by general activity. *Id.* But Dr. Soares described his gait, affect, judgment, and mood all as normal. *Id.* at 265. Meanwhile, Ramsey described his mood as "okay" and reported that the nightmares were alleviated by the prazosin, but that Angier was still not sleeping well due to the back pain. *Id.* at 238. Ramsey characterized his gait as slow. *Id.* at 240.

Dr. Soares implanted the MEDTRONIC spinal cord stimulator for a trial on February 4, 2022. Filing No. 6-1 at 268. Six days later, Angier reported excellent relief, with the spinal cord stimulator implant eliminating sixty percent of his back pain and ninety percent of his leg pain. *Id.* at 269. The spinal cord stimulator made performing chores easier and allowed him to sleep better. *Id.* On March 11, 2022, Dr. Soares permanently implanted the MEDTRONIC device, and it was programmed on March 21. *Id.* at 277, 281. On March 31, 2022, Angier's insurance expired, marking the date last insured ("DLI") for Social Security disability purposes. Filing No. 5-2 at 13.

Over the next three weeks, Angier complained that back pain was still waking him up and limiting him on a daily basis. Filing No. 6-2 at 4, 12. However, he informed Dr. Soares that he was getting "good relief" from the spinal cord stimulator, and Dr. Soares decreased his hydrocodone prescription from four to three times daily. Filing No. 6-1 at 283, 286. It appears Dr. Soares then continued to copy and paste his report about "good relief" for the following year, even as Angier's condition changed. *Id.* at 287, 295, 299, 305, 309, 313, 317, 320–21.

At the same time, Angier reported increased irritability and anger which he attributed to PTSD from his childhood abuse. Filing No. 6-2 at 12. Cusumano noted that he was bothered nearly every day by anxiety. *Id.* Angier also reported increased fatigue, which Ramsey initially believed to be a side effect of the prazosin but later attributed to increased depression. *Id.* at 4 (blaming prazosin); *id.* at 18 (attributing fatigue to depression and restarting prazosin after nightmares returned). Throughout May he continued to be bothered nearly every day by anxiety, depression, and irritability, and he attributed some of the irritability to his back pain. *Id.* at 13, 15. On May 23, Angier told

7

Ramsey he would lose focus easily and had "a lot of back pain that interferes with sleep." *Id.* at 16.

In July, despite copy-pasting his report about good relief, Dr. Soares increased Angier's hydrocodone prescription back to four times a day and noted "new onset myofascial pain of his low back." Filing No. 6-1 at 287, 290. Angier informed Ramsey he was moderately improved, and the prazosin was working to eliminate nightmares again, but his energy went up and down and his back pain was continuing to interfere with sleep. Filing No. 6-2 at 21–22. Like Dr. Soares's repeated comment about "good relief," much of Ramsey's July 2022 note echoed his previous notes. *Id.* at 24.

A month later, Cusumano wrote that Angier can "not keep a steady schedule due to his back" and that anxiety and irritability made his daily activities very difficult, but he also noted Angier had no trouble concentrating. Filing No. 6-2 at 29. His DLA score had increased to a 107. *Id.* at 27. In September, physical therapist Tanner Wiebelhaus noted that PTSD caused Angier to refuse treatments involving physical contact. Filing No. 6-1 at 304. Dr. Soares subsequently suggested lumbosacral orthosis bracing to improve Angier's back, and in December he added lumbar spondylolysis to Angier's visit issues. *Id.* at 309.

Angier's mental state seemingly deteriorated in 2023 and 2024, with Cusumano first noting crying spells and trouble remembering things in March 2023. Filing No. 6-2 at 54. Dr. Benjamin Rowley prescribed him buspirone for anxiety in July 2023, which provided some improvement. *Id.* at 72, 78. Cusumano noted in October 2023 that Angier was sleeping more and often immobilized; in the same visit Angier revealed that his childhood abuse was more extensive than he had previously disclosed. *Id.* at 83–84. In

December, Cusumano observed that Angier was anxious and depressed nearly every day, with trouble concentrating or focusing, and that he had an angry outburst at his son's school. *Id.* at 96. Also in December, Dr. Soares recorded that Angier had increasing leg pain despite the spinal cord stimulator, and he received another lumbar injection for his back pain. Filing No. 6-1 at 388–89.

In 2024, shortly before the administrative hearing, Cusumano wrote that Angier felt he was "in a downward spiral," which led to an emergency psychiatric consultation with Dr. Rowley. Filing No. 6-2 at 108–09. Cusumano noted Angier had trouble sleeping, issues with concentration, crying spells, and was interrupted even at home by pain both mental and physical. *Id.* at 109. Cusumano recorded specific statements from Angier about his ability to function in the workplace, including that he would be unable to maintain regular attendance or get through a normal workday. *Id.* Around the same time, Angier underwent a sleep study which rated him a seven on the Epworth sleepiness scale, within normal range. Filing No. 6-1 at 471. The examining nurse suggested adjusting the pressure on his CPAP machine to improve his sleep. *Id.* at 470.

### B. Medical Opinions

In June 2023, Angier's records were reviewed by Dr. Daniel Cronk, a surgeon, for the purposes of his Social Security filing. Filing No. 5-3 at 2–7. Dr. Cronk asserted the records were sufficient to show Angier had a severe lumbar spine condition, but he did not believe they gave him enough evidence to evaluate Angier's limitations as of the DLI. *Id.* at 5. Similarly, he thought the records were sufficient to show Angier suffered from bipolar disorder but not to establish how mental health symptoms would have limited Angier as of the DLI. *Id.* at 6. Dr. Cronk also indicated that the mental health symptoms might be secondary to chronic pain. *Id.* Despite finding the objective evidence lacking,

9

Dr. Cronk noted Angier's reported symptoms were consistent with the conditions from which he suffered. *Id.*

Dr. Joanell Wheeler, a radiologist, reviewed Angier's records in October 2023. Filing No. 5-3 at 8–14. Like Dr. Cronk, Dr. Wheeler found the objective evidence insufficient to evaluate Angier's limitations as of the DLI. *Id.* at 11. However, she classified his bipolar disorder as "programmatically non severe." *Id.* Also like Dr. Cronk, Dr. Wheeler described Angier's symptoms as consistent with his conditions. *Id.* at 13.

Cusumano also provided his medical opinion as Angier's treating therapist, writing on March 28, 2024. Filing No. 6-1 at 396–402. He labeled bipolar disorder as Angier's primary diagnosis, along with anxiety and nightmares from chronic PTSD, while listing physical pain, abuse, anger management, and headaches among "other" diagnoses. *Id.* at 397. Cusumano noted that sedation, drowsiness, and fatigue from Angier's medications would affect him in the workplace, and he gave clinical findings of inability to concentrate, anxiety, crying spells, social withdrawal, memory problems, and mood swings among others that would limit Angier at work. *Id.* Cusumano indicated that Angier had experienced a "significant cognitive decline" but did not specify in what area; he also marked that Angier had significant difficulties using academic skills and learning due to anxiety and physical pain. *Id.* at 398. On the checklist, Cusumano also noted that Angier had time-consuming preoccupation with his past abuse. *Id.*

On the portion of the checklist devoted to work abilities, Cusumano indicated that Angier had seriously limited memory, ability to carry out short and simple instructions, ability to make simple decisions, ability to take ordinary precautions, and ability to get along with others. Filing No. 6-1 at 399–400. He described Angier as unable to meet

competitive standards in understanding and remembering short and simple instructions, maintaining attention for two-hour segments, sustaining routine, working among others without getting distracted, responding to criticism or change, dealing with normal stress, and handling detailed instructions.  *Id.*  He characterized Angier as having no ability to function in maintaining regular attendance and punctuality, completing a day or week without psychiatric interruptions, performing at a consistent pace, or using public transportation.  *Id.*  The only areas where he described Angier as limited but satisfactory were requesting assistance, interacting with the general public, grooming, and behaving appropriately in social settings.  *Id.*  Cusumano characterized Angier's main hindrances as attendance, which he attributed to the combination of all his medical issues; pace, which he attributed to back pain and distractibility; irritability, which he attributed to PTSD and back pain; and mood swings, which he attributed to bipolar disorder.  *Id.* at 400.  He hypothesized Angier would miss more than four days of work per month.  *Id.* at 401.

### C.  Administrative Proceedings

Angier filed for disability benefits on December 5, 2022.  Filing No. 5-2 at 11.  After his claim was denied twice, he requested a hearing, which was held on April 16, 2024.  *Id.* at 32.  Angier was represented by his attorney, Kimberly Schram.  *Id.*

Angier testified about his continued pain and activities, including vacuuming, going up and down stairs sometimes, and mowing half the lawn.  Filing No. 5-2 at 41–43.  He estimated that he would only be able to lift twenty pounds two or three times a day, with worse pain after, and he could walk about a normal city block.  *Id.* at 44.  Angier also testified about taking care of his son, saying he could watch him fly a drone or walk around

the neighborhood with him.  *Id.* at 45.  He also testified he could drive and could sit on a bus, but he likely could not walk to a bus stop.  *Id.*

On examination by Attorney Schram, Angier testified that he would have trouble remembering things even in a supervisory role in the construction industry and would have days where he could barely get out of bed due to depression or back pain.  Filing No. 5-2 at 47.  He also stated that his vacuuming was limited because the twisting motion aggravated his back.  *Id.* at 48.  Angier admitted that he sometimes tried to lift more than he should.  *Id.*  Regarding his ability to sit or stand, Angier said he could sit in one place for ten or fifteen minutes, but that "[t]here's no rhyme or reason for which one [standing or sitting] makes it feel the least."  *Id.* at 48–49.  Angier testified the pain forced him to stay lying down an entire day about once a week and caused problems with concentration and focus.  *Id.* at 49.  He also discussed the likely effects of work requirements on his mental health, saying he would get irrationally anxious in traffic "like someone will get hit" and he would panic or have crying spells if he had to meet a quota.  *Id.* at 51.  He suggested he would likely need someone watching him to ensure he did his job correctly, but that would also aggravate his anxiety.  *Id.* at 52.  He confirmed that he wore a brace multiple days a week to help with the pain and struggled to drive with it.  *Id.* at 53.  As far as sleep, Angier said he gets only four or five hours of sleep on a good night due both to his back pain and nightmares from his childhood abuse, and fatigue affects him during the day.  *Id.*

The ALJ asked if Angier had been using cocaine, which he denied, and asked about his alcohol consumption.  *Id.* at 54.  Angier testified he had alcohol up to twice a week in social settings and did not believe he had an issue with alcohol.  *Id.*

12

The ALJ then questioned the vocational expert ("VE") about Angier's ability to do his past relevant work and the availability of other employment. Filing No. 5-2 at 55–56. The ALJ suggested the following residual functional capacity ("RFC") for his hypotheticals:

> This hypothetical individual is capable of performing the full range of light work; and has the ability to occasionally climb ropes, ladders, and scaffolds, ramps, and stairs, balance, kneel, stoop, crouch, and crawl. The individual should have no concentrated exposure to extreme cold temperatures or vibration; and is able to understand, follow, and complete simple instructions and tasks in jobs with no more than occasional contact with the general public and coworkers.

Filing No. 5-2 at 56. In response to this hypothetical, the VE answered that the individual would not be able to work as a glazer, construction foreman, or construction supervisor, but would be able to work at the SVP-2 level of light work. Id. The VE offered sample jobs at that level such as photocopy machine operator, with 19,000 such positions in the national economy; marker, with 115,000 positions in the national economy; and housekeeper, with 229,000 positions in the national economy. Id. The ALJ then asked if those roles could be performed by someone who missed four or more days of work per month, and the VE testified in his professional opinion they could not. Id. at 57.

Attorney Schram then questioned the VE if the hypothetical individual as described by the ALJ could still find employment if he was off-task more than sixteen percent of the day and could only remember simple instructions less than occasionally, and the VE testified that those limitations would bar a person from all competitive employment. Id. at 57–58.

A month later, the ALJ denied Angier's claim in an eleven-page written decision. Filing No. 5-2 at 11–22. The ALJ followed the sequential evaluation process that defines Social Security benefits decisions. Id. at 12–13. This requires the ALJ to determine (1) if the claimant is engaged in substantial gainful activity; (2) if the claimant has a medical

13

impairment or combination of impairments that is severe; (3) whether the severe impairment meets a specific listing in 20 C.F.R. § 404(p), Appendix 1; (4) whether the claimant has the RFC to perform past employment; and (5) whether the claimant's RFC would allow him to perform any other generally available jobs.  20 C.F.R. § 404.1520(a). The ALJ must proceed through these steps until a finding of disability can be definitively made or denied.  20 C.F.R. § 404.1520(a)(4).

Considering Angier's claim, the ALJ determined that the relevant evaluation period went from May 20, 2020, to March 31, 2022.  Filing No. 5-2 at 13.  He also found that Angier did not engage in substantial gainful activity during that period despite some unsuccessful attempts at working and that Angier had three severe impairments: degenerative disc disease of the lumbar spine, obesity, and bipolar disorder.  *Id.* Stressing that Angier's bipolar disorder was the only mental impairment he would consider as severe, the ALJ wrote:

> As a threshold matter, I am cognizant of the substantial overlap in symptomology between different mental impairments, as well as the inherently subjective nature of mental diagnoses.  Accordingly, the claimant's psychological symptoms and their effect on his functioning have been considered together, instead of separately, regardless of the diagnostic label attached.

*Id.* at 14.

Because Angier's impairments did not equal any of the listings, and he and his attorney did not argue they did, the ALJ proceeded to determine his residual functional capacity.  Filing No. 5-2 at 14–16.  He found Angier generally had the capacity to perform light work; to occasionally climb, balance, stop, kneel, crouch, and crawl; to understand, follow, and complete simple instructions and tasks; and that he should have no concentrated exposure to extreme cold or vibration and no more than occasional contact

14

with the general public and coworkers. *Id.* at 16. In his determination, the ALJ discussed Angier's testimony and said that his impairments could be expected to cause his symptoms but that Angier's subjective complaints about intensity, persistence, and limiting effects were not consistent with the objective evidence. *Id.* at 16–17. He then recited the medical history, emphasizing the "good relief" Angier initially reported from the spinal cord stimulator and finding that it continued into 2023. *Id.* at 17. The ALJ also highlighted that Angier was "generally observed to be in no distress, to have normal range of motion, intact sensation, negative straight leg raise testing, full strength, normal muscle tone, and a normal gait." *Id.* at 18. Reviewing Angier's mental health treatment, he noted periods of improvement as well as deterioration, including improvement in December 2021 continuing into January and February. *Id.* He also emphasized that Angier "generally exhibited a normal mood and affect, good insight and judgment, normal behavior, intact concentration, a cooperative demeanor, good eye contact, a normal memory, and good hygiene." *Id.* As such, he found Angier's symptoms would only produce the limitations in the RFC, not the additional issues to which Angier had testified. *Id.*

The ALJ then turned to the medical opinion testimony, stressing that current regulations did not specify the weight to be given to any medical opinion. Filing No. 5-2 at 19. He considered the state agency's opinions provided by Dr. Cronk and Dr. Wheeler. *Id.* In both their physical and mental evaluations, he found their opinions not entirely consistent. *Id.* The ALJ reasoned that if there was enough evidence to find a severe impairment of Angier's back, there ought to be enough evidence to establish his limitations; and he found that their conclusion of minimal mental impairment was not

15

supported by the other evidence, including Angier's testimony. *Id.* Considering Cusumano's opinion, the ALJ found it not internally consistent. *Id.* at 20. He stated that Cusumano's opinion was not supported by "the brief explanations he provides in response to the questions on the form itself" or by his own treatment notes, especially as mental status updates were "largely normal" and Angier's symptoms were under "good control." *Id.* As such, he labeled Cusumano's opinion as also unpersuasive and decided the RFC based on his interpretation of the objective medical evidence, focusing on "the claimant's overall pattern of treatment, the efficacy of said treatment, and his own admitted abilities and activities." *Id.*

Having determined Angier's RFC, the ALJ then ruled out a return to his past relevant work. Filing No. 5-2 at 20. However, he found Angier not disabled based on step five of the sequential evaluation because there were other jobs in the national economy he could have performed with his RFC. *Id.* The ALJ relied on the VE's response to the hypothetical, omitting the limitation of four absences a month and the limitations Attorney Schram had posed. *Id.* at 21. As such, Angier's claim was denied. *Id.* at 22.

Angier appealed, but the Social Security Appeals Council denied his request to review the decision. Filing No. 5-2 at 2. On June 24, 2025, he filed suit in this Court. Filing No. 1.

## II. STANDARD OF REVIEW

This Court has jurisdiction to review the Social Security Administration's disability decisions. 42 U.S.C. § 405. The Court will uphold the ALJ's decision if it is founded on substantial evidence in the record as a whole. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). Substantial evidence only requires "such relevant evidence as a

16

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). This standard is less than a preponderance of the evidence. *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017).

The ALJ is entitled to "abundant deference," but the requirement that the Court look for substantial evidence in the record as a whole means its review must be more searching than the ordinary substantial evidence standard. *Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998); *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). It requires considering evidence that detracts from the ALJ's decision. *Grindley*, 9 F.4th at 627. The ALJ must give "permissible" weight to the evidence, *Lawrence v. Saul*, 970 F.3d 989, 996 (8th Cir. 2020), and his decision must be within the "available zone of choice," *Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir. 2022). The Court is not allowed to reweigh the evidence. *Mabry v. Colvin*, 815 F.3d 386, 389 (8th Cir. 2016). If the ALJ's decision is within the available zone of choice and weighs the evidence permissibly, the Court will not reverse it even if there is also substantial evidence supporting a contrary decision. *Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). Nor will the ALJ be reversed for poor drafting of his opinion. *Grindley*, 9 F.4th at 629.

Angier raises three issues with the ALJ's findings to this Court: failure to develop the record, failure to give proper weight to Cusumano's opinion, and improperly discounting Angier's subjective complaints. Filing No. 9 at 2. Angier argues that all three issues combine in a general error of "playing doctor while interpreting the objective medical evidence." *Id.* *See also* Filing No. 11 at 2 (Commissioner's brief in support acknowledging the "general issues" in a Social Security case include whether substantial

17

evidence on the record as a whole support the findings of fact).  Because this general error was raised within the three issues presented to the Court, the Court will also consider whether the ALJ erred by playing doctor and making medical findings unsupported by substantial evidence in addition to the three separate errors Angier alleges.

### III. ANALYSIS

Disability is determined according to the sequential evaluation set out in the Code of Federal Regulations.  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  Legally, claimants are disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant must meet this definition of disability at the DLI to qualify for disability benefits.  *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014).

The ALJ has a duty to fully and fairly develop the record, even though the claimant has the burden of proving disability in steps one through four.  *Combs*, 878 F.3d at 646. On step five, the burden of proof shifts to the Commissioner to prove other work within the claimant's RFC exists in the national economy.  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  The burden of persuasion remains with the claimant even at step five. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  Testimony by a vocational expert in response to a properly framed hypothetical provides enough evidence to meet the Commissioner's burden.  *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005).

18

In reviewing the evidence, the ALJ may not substitute his own opinions for those of a physician. *Combs*, 878 F.3d at 647. Accordingly, the ALJ's own beliefs and observations are not enough to satisfy the substantial evidence standard. *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989). In particular, the claimant's RFC is a medical question and the ALJ's findings must be based on medical evidence. *Noerper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020). Deciding the RFC, however, is fundamentally an administrative matter and cannot be deferred to medical professionals. *Id.* Moreover, while the ALJ must consider all relevant evidence, it is only error if he fails to consider a piece of relevant evidence, not if he puts a different but permissible weight on it. *See Harris v. Sec'y of Dep't of Health & Hum. Servs.*, 959 F.2d 723, 724–25 (8th Cir. 1992); *Lawrence*, 970 F.3d at 996. That said, the ALJ may not review the medical record selectively and only cite facts that support his findings. *See Pate-Fires*, 564 F.3d at 944 (recounting a series of Global Functioning Assessments that do not match the ALJ's general description); *see also Cole v. Colvin*, 831 F.3d 411, 416 (7th Cir. 2016) (referring to such a decision as "cherry picking the medical record"). Finally, the ALJ's findings on the claimant's RFC must include the combination of all impairments, *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003), and his findings on disability must reflect the claimant's "actual ability to find and hold a job in the real world," *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984).

The Court finds the ALJ did not base his findings on substantial evidence. Specifically, the ALJ collapsed Angier's mental health impairments into a single diagnosis based on his own beliefs, without citing medical or precedential authority, and contrary to objective medical evidence that suggested unique symptoms from at least two

distinguishable mental conditions—bipolar disorder, and PTSD. The ALJ also cherry-picked the record, making general assertions about the objective medical findings that are not fully supported and ignoring the instances that contradicted his decision. Finally, the ALJ improperly discounted Angier's subjective complaints. For all these reasons, the Court finds that there was not substantial evidence to support a finding that Angier was not disabled; and, as the record was sufficiently developed, the Court reverses and remands for an award of benefits rather than requiring further proceedings.

### A. The ALJ Sufficiently Developed the Record to Make a Finding on Disability

Disability determination, although characterized in terms of parties and burdens of proof, is not supposed to be an adversarial process. *Noerper*, 964 F.3d at 747. Thus, the ALJ is obliged to develop the record, even when the claimant is represented by counsel. *Id.* Because the ALJ's decision must be supported by substantial evidence, the ALJ must ensure the record contains substantial evidence, including evidence from a physician when determining the claimant's RFC. *Lauer v. Apfel*, 245 F.3d 700, 703–04 (8th Cir. 2001). Reports alone, however, can constitute substantial evidence. *See Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (discussing the difference between clarity and authenticity questions and asserting substantial evidence may be found in a record containing "detailed clinical data and observations about the claimant's limitations").

Lack of a medical opinion cannot be substantial evidence. *Pate-Fires*, 564 F.3d at 943. Nor does a treating doctor's failure to comment on work capacity constitute substantial evidence about the claimant's RFC. *Hutsell*, 259 F.3d at 712. If there is no evidence in the record about a claimant's functional limitations in the workplace, the ALJ should seek additional evidence. *Smith v. Barnhart*, 435 F.3d 926, 930–31 (8th Cir. 2006).

20

Similarly, finding no medical opinions credible gives the ALJ a reason to develop the record further. *Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008). However, the ALJ need not have a specific medical opinion to support his findings on the claimant's RFC. *Hensley*, 829 F.3d at 932. The ALJ's affirmative duty to seek additional evidence only arises when "a crucial issue is underdeveloped." *Combs*, 878 F.3d at 647 (quoting *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008)).

In this case, the ALJ did not have a duty to seek out additional medical opinions. Considering he found none of the medical opinions about Angier's mental health persuasive, he may have been well advised to develop the record further. However, this is a case where the objective record does not lack for detail. The administrative record contained over 1,200 pages of medical records detailing Angier's back problems and mental health treatment. Even without a specific medical opinion on Angier's functional limitations, there was sufficient medical evidence for the ALJ to conclude that no "crucial issue" was underdeveloped. Therefore, he did not have an affirmative duty to seek additional medical opinion evidence such that failure to do so constitutes reversible error.

### B. The ALJ Properly Applied the Current Regulations in Finding Cusumano's Opinion Unpersuasive

The regulations for weighing medical opinions changed for applications submitted after March 27, 2017, eliminating the former requirement that an ALJ grant a treating physician's opinion controlling weight. *Austin*, 52 F.4th at 728. Under the current regulations, the ALJ is required to consider five factors to determine the persuasiveness of a medical opinion: 1) support from objective medical evidence; 2) consistency with other medical sources and objective evidence; 3) relationship between doctor and claimant; 4) area of specialization; and 5) any other relevant factors. *Id.*; *see also* 20

C.F.R. § 404.1520c(c).    The ALJ is directed primarily to consider the first two factors;
supportability and consistency.    *Id.*    However, the ALJ need not use the words
"supportability" and "consistency" in his opinion.    *Goss v. Kijakazi*, No.
421CV00663LPRJJV, 2022 WL 1511521, at *3 (E.D. Ark. May 12, 2022).    He is simply
required to give "good reasons" for his evaluation and to write clearly enough to permit
judicial review.  *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020).

As with the ALJ's decision as a whole, his findings on the persuasiveness of a
particular medical opinion are generally entitled to deference provided they are supported
by substantial evidence.  *Cropper v. Dudek*, 136 F.4th 809, 814 (8th Cir. 2025).    Moreover,
the Court will not assess whether the ALJ's findings on each factor are supported by
substantial evidence but merely whether his whole assessment of persuasiveness is
supported.  *Id.*

If a physician's opinion differs significantly from the objective medical evidence,
the ALJ is justified in finding it inconsistent.  *Casey*, 503 F.3d at 692.    An ALJ is also
justified in finding a physician's opinion inconsistent with the record or unsupported if his
treatment notes do not align with his opinion about disability.  *Flynn*, 513 F.3d at 793–94.
A physician's opinion based on the claimant's subjective reports may be discounted if it
conflicts with the objective evidence.  *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir.
2017).    Even if consistent with the record, a physician's conclusory statements may also
be given limited weight.  *Grindley*, 9 F.4th at 632.

When considering mental health, it must be noted that symptoms should be
expected to improve at times and worsen at others.  *See Andler v. Chater*, 100 F.3d 1389,
1393 (8th Cir. 1996) ("Unlike many physical impairments, it is extremely difficult to predict

the course of mental illness. Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." (Citation omitted)). This can cause unpredictable effects on a claimant's ability to function in the workplace. *Mabry*, 815 F.3d at 392 (observing that mental health can cause functioning levels to vary significantly over time). Temporary improvements should not be overstated. *Nowling v. Colvin*, 813 F.3d 1110, 1123 (8th Cir. 2016) (rebuking the ALJ for focusing on statements about "improvement" without acknowledging that the claimant's condition fluctuated over a long period). However, consistent stable reports may give the ALJ cause to find the physician's opinion unsupported. *Cropper*, 136 F.4th at 815 (upholding the ALJ's analysis based on treatment notes that Cropper was "consistently doing 'alright'").

Angier complains that the reasons given by the ALJ for finding Cusumano's opinion unpersuasive were not "good reasons" and ignored specific pieces of objective medical evidence which aligned with his opinion, particularly the incident in which Angier scratched his hand open from anxiety. Filing No. 9 at 19–20. The Commissioner responds that many of Angier's mental health reports reflect improvement and control of his symptoms, though he acknowledges that these reports are broken up by periods where Angier's symptoms worsened. Filing No. 11 at 9. Neither of these arguments are persuasive; Angier asks the Court to reweigh the evidence, which is not within its purview, and the Commissioner overlooks the nature of mental impairments. However, reviewing the record as a whole, the ALJ had good reasons to find Cusumano's opinion unpersuasive.

While Cusumano wrote that Angier was unable to meet competitive standards in memory and attention span, multiple providers consistently recorded good memory,

23

concentration, focus, judgment, and insight. *See* Filing No. 6-1 at 193 (memory grossly intact, attention intact, judgment and insight fair as of October 12, 2020, according to Fernandes); *id.* at 222–24 (good concentration and focus, recent and remote memory intact, insight and judgment good as of November 15, 2021, according to Ramsey); *id.* at 234 (same as of December 27, 2021); Filing No. 6-2 at 4, 6 (concentration and focus, judgment, and insight good and recent and remote memory intact as of April 5, 2022, according to Ramsey). Cusumano indicates Angier would be limited in other areas based on Angier's subjective complaints. Filing No. 6-2 at 109 ("Client reports he would have trouble maintaining regular attendance in being punctual with a full-time job, with his back pain and mental health issues completing a normal workday would be quite difficult and not being able to perform at a consistent pace required for work."). Notes from his session with Angier on March 28, 2024, echo his disability opinion, which was written the same day. Filing No. 6-2 at 108–09.

Moreover, some of the limitations recorded in Cusumano's opinion only appear in his treatment notes after the DLI, such as crying spells. Filing No. 6-2 at 54 (reporting crying for the first time on March 3, 2022); *id.* at 96 (recording for the first time on December 12, 2023, a specific instance of an angry outburst by Angier). If Cusumano's opinion reflects Angier's deteriorated condition as of April 2024, those limitations are irrelevant to whether he was disabled by the DLI. *See Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) (observing that evidence from outside the insured period is only relevant to elucidate the claimant's condition during that period).

24

Therefore, while the ALJ may have improperly highlighted the intervals of improvement in Angier's mental health treatment, he was not without substantial evidence to find Cusumano's opinion unpersuasive.

### C. The ALJ Improperly Discounted Angier's Subjective Complaints and Mischaracterized the Objective Evidence

An ALJ must consider, but is not required to credit, a claimant's subjective complaints. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). A claimant's "credibility" about his subjective complaints is primarily a question for the ALJ. *Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016); *see also Krieg v. Kijakazi*, No. 4:22-CV-906 SRW, 2023 WL 4824558, at *9 (E.D. Mo. July 27, 2023) (noting that the word "credibility" has been replaced with a consideration of "consistency" between the claimant's subjective complaints and the objective medical evidence). As with the rest of the decision, the ALJ's findings on the consistency of a claimant's subjective complaints will be upheld if they are supported by substantial evidence and good reasons. *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016).

A claimant's statements alone do not establish disability. *Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017). There must be medical evidence to support these subjective complaints. *Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974). However, subjective complaints, if consistent with the medical evidence, can serve as the basis for an award of disability benefits. *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975).

In assessing the consistency of a claimant's subjective complaints, the ALJ must consider several factors. *Moore*, 572 F.3d at 524. The United States Court of Appeals for the Eighth Circuit set out five factors in 1984: "1. the claimant's daily activities; 2. the

duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). To these five factors two more have been added through case law: the claimant's work history and the absence of objective medical evidence to verify the claimant's subjective complaints. *Finch*, 547 F.3d at 935. The ALJ is not required to discuss every factor, just to consider them. *Casey*, 503 F.3d at 695.

In this case, the ALJ did not cite *Polaski* but noted duration, frequency, and intensity of symptoms as a basis for finding Angier's subjective complaints inconsistent with the medical evidence. Filing No. 5-2 at 19. Concluding his section on Angier's RFC, the ALJ asserted his findings were supported by Angier's "overall pattern of treatment, the efficacy of said treatment, and his own admitted abilities and activities." *Id.* at 20. These statements suggest the ALJ applied the factors test required by the Eighth Circuit. In reviewing the record as a whole, however, the Court does not find substantial evidence to support the ALJ's finding that Angier's subjective complaints were inconsistent with the medical evidence.

### 1. The duration, intensity, and frequency of Angier's physical and mental symptoms was consistent with the evidence.

As discussed above, mental health symptoms should be expected to fluctuate and brief periods of improvement are not inconsistent with subjective complaints that they would be disabling in the workplace. The ALJ should also consider that claimants with mental impairments may not have as much functionality as they would like to believe. *Hutsell*, 259 F.3d at 711. They may also have to structure their lives so as to avoid stressors, including other people, which would worsen their symptoms. *Id.*

26

The ALJ noted that Angier reported good mood and control of his symptoms in in September 2021 but acknowledged that he reported feeling depression and anxiety "at the end of the month." Filing No. 5-2 at 18. Similarly, he notes improvement in October and deterioration in November. *Id.* The main improvement he emphasizes comes in December 2021, which he asserts "continued into January and February 2022." *Id.* However, while Angier's DLA score was slightly improved on December 10, 2021, he continued to report anxiety, depression, and sleep disturbances in visiting other doctors for his back pain. Filing No. 6-1 at 229–31 (reporting a DLA score of 104 to Cusumano with progress in anger management and positive results from medications); *id.* at 7 (reporting psychological symptoms to Dr. Fuller on December 14). On December 27, Ramsey recorded his mood as "depressed and 'tired'" and noted that he was still having nightmares. *Id.* at 233–35. His nightmares were alleviated in January by prazosin, but Ramsey still recorded his mood as "'okay' and 'tired.'" *Id.* at 238. In February, Cusumano reported he was "doing much better with anger management and managing his anxiety" but concerned about his son. *Id.* at 243–44. These reports do not paint a picture of significant or lasting improvement; rather, they are more like the ups and downs the ALJ noted late in 2021. Such ups and downs are to be expected with mental impairments. *Nowling*, 813 F.3d at 1123.

In reviewing Cusumano's notes, the ALJ noted that Angier's status is often normal, and his symptoms are under control with medication. Filing No. 5-2 at 20. He is correct that the prazosin seems to control Angier's nightmares, and Fernandes states that Angier's bipolar disorder is controlled by the medication. Filing No. 6-1 at 243 (referencing the effectiveness of prazosin); *id.* at 212 ("symptoms are controlled" with

regard to bipolar disorder in September 2021). However, Angier's anxiety and depression continued to recur, as detailed above. The ALJ considers these as bipolar symptoms rather than separate diagnoses, but if so, they contradict the isolated statement that Angier's medications controlled his mental impairment. Moreover, in January 2023 when Dr. Rowley describes Angier as "same overall", he also records that Angier was "[v]ery tired, no energy or motivation" and his anxiety was high. Filing No. 6-2 at 47. Cusumano repeats the phrase about Angier being the same at the beginning of February but then goes on to write extensively about Angier's severe depression. Id. at 52. Thus, the ALJ's emphasis on "normal" reports also appears to be a superficial and incorrect reading of the record.

Discussing Angier's back pain, the ALJ writes "he was generally observed to be in no distress, to have normal range of motion, intact sensation, negative straight leg raise testing, full strength, normal muscle tone, and a normal gait." Filing No. 5-2 at 18. While some of those issues were never in question, such as sensation and muscle tone, the ALJ is incorrect about others. During the evaluation period, Angier only once had a purely negative straight leg raise, and even that caused back pain. Filing No. 6-1 at 39 (negative straight leg raise but elicited back pain in April 2021). Two other instances were negative on a modified sitting test, while four were positive on the left and two more had limited motion. Filing No. 5-7 at 30 (modified test in January 2021); id. at 49 (limited range of motion at 58 and 55 degrees, respectively, due to stiffness and pain, in July 2020); Filing No. 6-1 at 8 (positive on left in December 2021); id. at 14 (modified test in August 2021); id. at 19 (range of motion limited to 50 degrees by lower back pain in August 2021); id. at

28

26 (positive on the left in June 2021); *id.* at 31–32 (straight leg raise in May 2021 positive on the left).  The ALJ's characterization in this regard is wholly inaccurate.

Angier's gait is closer to the ALJ's characterization; more than half the time, it is described as "normal" or "steady."  Filing No. 5-7 at 34 (normal gait in January 2021); *id.* at 45 (normal gait in July 2020); *id.* at 85 (normal gait in April 2021); *id.* at 93 (normal gait in January 2021); Filing No. 6-1 at 14 (normal gait in August 2021); *id.* at 70 (normal gait in May 2021); *id.* at 185 (steady gait in October 2020); *id.* at 192 (normal gait in October 2020); (steady gait in September 2021); *id.* at 257 (normal gait in November 2021); *id.* at 260 (normal gait in December 2021); *id.* at 265 (normal gait in January 2022); *id.* at 271 (normal gait in February 2022); *id.* at 275 (normal gait in March 2022).  But there are still a significant number of occasions when Angier's gait is noticeably limited.  Filing No. 6-1 at 8 (bilaterally antalgic gait in December 2021); *id.* at 32 (limping on left in May 2021); *id.* at 39 (gait "extremely antalgic" in April 2021); *id.* at 46 ("gait problem" in December 2021); *id.* at 87 (antalgic gait referred to left in December 2021); *id.* at 224 (gait slow with "back pain issues" in November 2021); *id.* at 234 (same in December 2021); *id.* at 240 (same in January 2022).  The ALJ's statement about Angier's gait is overbroad. Combined with his mischaracterization of the straight leg raise testing and his focus on irrelevant issues, his assessment of the condition of Angier's back is not supported by substantial evidence.

While the Court cannot reverse the ALJ's decision merely because substantial evidence would have supported an alternative outcome, in this case, the ALJ's assessment of the duration, frequency, and intensity of Angier's symptoms, both mental and physical, is not supported by substantial evidence.

### 2. Angier's Pattern of Treatment is Consistent with his Subjective Complaints.

While "pattern of treatment" is not one of the *Polaski* factors and does not directly relate to credibility, the ALJ cited it in his overall findings of Angier's RFC.  Filing No. 5-2 at 20.  Pattern of treatment is relevant to both RFC and credibility, as a claimant's refusal to pursue a course of treatment or medical advice may undermine a claim of disability. *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) ("A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications.").  Conversely, a long history of surgeries, implants, and continued attempts at treatment can bolster a claimant's credibility.  *Cox*, 160 F.3d at 1207 ("We question whether a claimant with seven years of medical records detailing repeated complaints of severe pain, who undergoes three back surgeries in the hopes of alleviating that pain, and who now lives with a morphine pump implanted in her body, can be found not credible . . ."); *Singh*, 222 F.3d at 453 (reversing the ALJ's findings on the claimant's subjective complaints when he had "repeated and consistent visits to doctors," "numerous prescription medications," and "many pain treatment modalities").

In this case, especially as the ALJ failed to elaborate what part of Angier's pattern of treatment was inconsistent with his subjective complaints, it is hard to see how the pattern of treatment is inconsistent with his subjective complaints or suggests a greater RFC than he testified to.  Angier has had two surgeries on his back and explored a third. Filing No. 6-1 at 263 (Dr. Soares recounting a consultation in January 2022 recommending against a third surgery).  He tried to have a spinal cord stimulator implanted in his back and was initially denied by his insurance, then had it implanted

30

permanently in March 2022.   Filing No. 5-7 at 178 (denial);  Filing No. 6-2 at 277 (permanent implant).  After initially refusing to take opiates, he gave in and tried at least four over the course of the five years of records provided to the ALJ.  Filing No. 5-7 at 158 (opposition); *id.* at 30 (oxycodone); *id.* at 80 (hydrocodone); *id.* at 181 (morphine); Filing No. 6-1 at 78 (hydromorphone).  Dr. Soares wrote, in one of his oft-copied notes, that Angier had "tried and failed more conservative measures and were either ineffective or intolerant.  In my medical opinion non-opiate therapy is not appropriate to address the patient's medical condition at this time."  Filing No. 6-1 at 257.

With regard to his mental symptoms, Angier regularly saw Cusumano for therapy as well as Ramsey and Dr. Rowley for psychiatric treatment, and he took five different medicines for various symptoms.  Filing No. 6-1 at 167 (lamotrigine prescribed for bipolar disorder in February 2019); *id.* at 225 (prescribing prazosin in November 2021 for PTSD-related nightmares); *id.* at 408 (increasing duloxetine in January 2019 for bipolar disorder); Filing No. 6-2 at 6 (prescribing cyproheptadine instead of prazosin for nightmares and to reduce fatigue); *id.* at 18 (adding bupropion in May 2022 for depression); *id.* at 72 (prescribing buspar in July 2022 for anxiety).  While not all of those medications were taken during the review period, they relate to his complaints during that time.   Moreover, there is no indication from his doctors that he failed to follow his medication regimen.  As such, his pattern of treatment is consistent with his self-reported limitations.

### 3. Angier's Treatment Was Less Effective Than the ALJ Believed, Causing Him to Erroneously Discount Angier's Subjective Complaints and Assign Him a Higher RFC

If treatment can bring a medical condition under control, the claimant is not disabled.  *Hensley*, 829 F.3d at 933–34.  This requires that the condition be controlled

31

enough to function in the workplace. *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). Particularly with mental illness, a person may be able to function in a highly structured home environment but not in the workplace. *Hutsell*, 259 F.3d at 711.

The ALJ relied on Dr. Soares's copy-pasted notes that read that Angier was receiving good relief from his spinal cord stimulator "into 2023." Filing No. 5-2 at 17. However, a careful review of the record shows that Angier continued to complain of pain over the next two months after the stimulator was implanted. Filing No. 6-2 at 13, 15–16. In July 2022, Dr. Soares himself noted new back pain and increased Angier's dose of hydrocodone. Filing No. 6-1 at 287, 290. Therefore, the relief Angier experienced from the spinal cord stimulator was far more limited than the ALJ believed and did not control his impairment for a meaningful period of time.

With regard to his mental impairments, his medications provided relief in some areas, but not enough to believe he could function in the workplace. For example, prazosin seemed genuinely effective against his PTSD-related nightmares. Filing No. 6-2 at 21. Well after the DLI, buspar seemed to alleviate Angier's anxiety. Filing No. 6-2 at 78. However, his bipolar disorder continued to interfere with his daily functioning. Filing No. 6-1 at 180 (bipolar symptoms worsening in October 2020, leading him to first consult Cusumano, even with lamotrigine and duloxetine). The ALJ noted ups and downs in Angier's symptoms in 2021, which suggests they were not fully controlled by his medications. Filing No. 5-2 at 18. Moreover, since Angier was not working, he was able to structure his life at home to avoid stressors, as in *Hutsell*. Therefore, the ALJ's findings on the effectiveness of Angier's treatment are not supported by substantial evidence.

#### 4. *Angier's daily activities are consistent with the medical evidence and with a finding of disability.*

A claimant need not be bedridden to be disabled. *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007). However, a claimant's daily activities may indicate whether he has the capacity to perform more work than his asserted limitations. *See Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) (suggesting that ability to perform extensive household chores "reflect[s] negatively" on a claimant's assertions of disabling pain). However, the ALJ should not place "undue emphasis" on a claimant's daily activities. *Harris*, 959 F.2d at 726.

Just what daily activities are sufficient to find a claimant's subjective complaints inconsistent is difficult to say. *Compare Bates v. Chater*, 54 F.3d 529, 531 (8th Cir. 1995) (upholding the ALJ's rejection of Bates's subjective complaints about his back injury because he "was able to carry things, such as groceries and his daughter, and his daily activities included helping with vacuuming, dishes, laundry, and occasionally driving and going shopping"), *and Moore*, 572 F.3d at 524 (finding "doing household chores, preparing meals, and going out to eat" enough for the ALJ to find the claimant's subjective complaints about fibromyalgia not credible), *with Ross v. Apfel*, 218 F.3d 844, 849 (8th Cir. 2000) (finding ability to "mow the lawn, helping to paint his uncle's cabin, driving, watching television, and sitting on a fishing boat" was consistent with having disabling pain at least twice a week from sickle cell anemia), *and Ford*, 518 F.3d at 983 (finding washing a few dishes, ironing isolated items of clothing, making a few meals a week, and reading consistent with subjective complaints of disabling shoulder and neck pain and depression). But direct contradictions are, of course, relevant. *See Vance*, 860 F.3d at 1121 (finding claimant's subjective complaints not credible when she testified she could

33

not walk without falling or cook for herself despite evidence showing she would shop for three or four hours and cooked her own meals when alone).  But in assessing a claimant's activities overall, the ALJ must remember "[t]he ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work." *Ross*, 218 F.3d at 849.

Some specific activities are easier to parse.  A failed work attempt is not contradictory to a claimant's subjective complaints.  *Harris*, 959 F.2d at 726.  At home, caring for a child with a disability is inconsistent with subjective complaints of disabling pain. *Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004).  However, caring for an elderly relative, with at least some assistance from another person and without more details, is not substantial evidence for the ALJ to reject a claimant's subjective complaints. *Papesh v. Colvin*, 786 F.3d 1126, 1134 (8th Cir. 2015).

Angier's activities are best described as "sporadic light activities."  At the hearing, he testified that he could sometimes vacuum but would have to stop if the twisting motion became too much for his back. Filing No. 5-2 at 48.  He testified that he could mow about half the lawn before stopping. *Id.* at 43.  This is consistent with the medical records, which suggest he had limitations in performing household chores. *E.g.* Filing No. 6-1 at 269 (recording he could "perform chores around the house easier and overall improved participation within the household" during the spinal cord stimulator trial in February 2022).

Cusumano's treatment notes indicate he was caring for his son, who was ten at the time of the hearing. *E.g.* Filing No. 6-1 at 207 (noting Angier "helps to take care of . . . his children," though elsewhere it is recorded that Angier's other two children live with

34

his ex-wife).  Details of how he helps take care of his son are not abundant but do involve driving at times.  Filing No. 6-2 at 90 (as of November 28, 2023, Cusumano wrote, "He has been helping around the house when he can, and continues to help with the children including their transportation needs while his wife continues to work full-time").  In January 2020, before his first back surgery, he was counseled to go to the ER but told the doctor he had to pick up his son from school first.  Filing No. 6-1 at 97.  At the hearing, Angier testified that spending time with his son meant going outside and watching him fly a drone or maybe walking around the neighborhood.  Filing No. 5-2 at 45.  This sort of taking care of a child is not inconsistent with disabling pain.

The only evidence of Angier's activities that would be inconsistent with disabling pain comes from the two occasions on which he aggravated his back, moving Christmas decorations and lifting a landscaping block.  It is unclear if the landscaping block was part of an unsuccessful work attempt, as the records indicate Angier attempted to return to work a few times during the evaluation period.  Angier also admitted that he sometimes tried to lift more than he should.  Filing No. 5-2 at 48.  Moreover, in January 2020, Angier told his doctor he had a flare-up of severe back pain while simply sitting on the couch. Filing No. 6-1 at 102.  In December 2021, his back pain returned without any apparent explanation at all.  *Id.* at 10.

Overall, there is no substantial evidence of daily activities inconsistent with Angier's testimony about his physical limitations, and the ALJ did not suggest that he undertook any daily activities inconsistent with his mental limitations.  This appears to be a case in which the ALJ put "undue emphasis" on Angier's daily activities.  *Harris*, 959 F.2d at 726.

35

### 5. The other consistency factors also do not provide substantial evidence for the ALJ to discount Angier's subjective complaints.

The ALJ is not required to specifically discuss all the *Polaski* factors. *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011). Provided the ALJ considers the factors and gives good reasons for discounting the claimant's subjective complaints, the Court will defer "even if every factor is not discussed in depth." *Id.* (quotation omitted). Therefore, if the Court does not defer to the ALJ's reasons, it is fitting for the Court to review the other factors even though the ALJ did not specifically cite them.

There is little evidence in the medical records about aggravating factors for Angier's mental health symptoms, although Wiebelhaus testified that physical contact aggravated his PTSD. Filing No. 6-1 at 304. Angier testified at the hearing that he would get anxious in traffic "like someone will get hit," that he would get anxious being under close supervision or having to meet a quota, and that watching his son ride his bike or seeing someone cross the street aggravated his anxiety. Filing No. 5-2 at 50–52. With regard to his back, the medical records indicate aggravating factors in July and August 2020 included bending, lifting, turning, and walking. Filing No. 5-7 at 39, 42. In January 2021, Angier reported his pain was worse with standing, sitting, walking, bending, lifting, pushing, pulling, and turning, with relief from medication, heat, rest, ice and stretching. Filing No. 5-7 at 30, 35. In May 2021, aggravating factors included walking, lifting, or bending, and the pain improved with changing positions. In June 2021, he reported the pain was worse with bending and prolonged positions. *Id.* at 24. In August 2021, aggravating factors included walking, bending, and turning. *Id.* at 11. In December 2021, they included standing, sitting, prolonged positions, and movement. *Id.* at 5. In January 2022, Angier reported the pain was worse with general activity and better with rest. *Id.* at

36

263. All of these are just recounting Angier's subjective reports, but they are consistent with his testimony about his limitations during that period.

With regard to functional limitations, the Court examines whether any doctors restricted the claimant's activity during the evaluation period. *See Moore*, 572 F.3d at 525 (questioning whether the claimant's functional limitations were "at the direction of any physician"). A lack of functional restrictions may make the claimant's subjective complaints inconsistent with the record as a whole. *Id.* Similarly, if the claimant is authorized to resume "full work activities" yet still complains of disabling pain, those subjective complaints can be found inconsistent. *Bryant v. Colvin*, 861 F.3d 779, 783 (8th Cir. 2017).

Angier was provided with post-surgical restrictions at the beginning of the limitation period in July 2020. Filing No. 5-7 at 53. After the second surgery, Dr. Fuller instructed that he could "[r]esume . . . full activity as tolerated" while ordering six weeks of intensive physical therapy. Filing No. 6-1 at 15. The physical therapy program included building up his walking tolerance, then about four blocks, and completing home exercises. *Id.* at 19–20. The ALJ considered the initial restrictions in his analysis of the medical opinions, but he decided Dr. Fuller's opinion as expressed in those restrictions was unpersuasive because Angier improved with time and treatment. Filing No. 5-2 at 19. Considering them for the purposes of Angier's subjective complaints, they do not necessarily support his statements about the duration, intensity, and frequency of his symptoms. However, the phrase "resume . . . full activity as tolerated" is distinguishable from the clearance to return to work in *Bryant*, particularly when combined with instructions to complete intensive physical therapy.

A claimant's good work history can bolster the credibility of his subjective complaints. *Cole*, 831 F.3d at 415. *Cf. Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (upholding the ALJ's findings discounting subjective complaints when the claimant had a "sporadic" work history indicating low motivation to work even prior to his disability). In this case, Angier worked consistently from 2005 to 2017 in construction, suffering his back injury in 2017 and thereafter only engaging in substantial gainful activity working for Doordash for a month or two in 2019. Filing No. 5-6 at 19. While Angier left work before the beginning of the evaluation period, the record shows that he worked consistently for more than a decade previously and stopped work around the time of his initial injury. Thus, his work history does not make his subjective complaints inconsistent with the record as a whole.

Finally, the absence of objective medical evidence supporting the claimant's subjective complaints can render them inconsistent with the record as a whole. *Melton v. Apfel*, 181 F.3d 939, 941 (8th Cir. 1999). However, the ALJ cannot reject a claimant's subjective complaints simply because the objective evidence does not fully support them. *Ford*, 518 F.3d at 982. An inconsistent history of treatment and complaints disproportionate to the medical evidence suggest that subjective complaints are inconsistent with the record as a whole. *See Finch*, 547 F.3d at 936 (upholding the ALJ's findings on credibility when "an objective medical cause ha[d] not been established" for the claimant's pain); *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000) (upholding findings on credibility when doctors "could find no evidence of active rheumatoid arthritis"); *Turpin*, 750 F.3d at 991, 994 (finding the ALJ correctly omitted lumbar

38

radiculopathy from the claimant's impairments when her reported symptoms were "really out of proportion" to the MRI).

As discussed above, Angier's pattern of treatment is consistent with his subjective complaints. Unlike the claimant in *Finch*, the cause of Angier's back pain is objectively verifiable. *See* Filing No. 5-3 at 6, 13 (affirming that Angier's symptoms are consistent with his conditions although the past DLI prevents an objective opinion about his limitations). Unlike the claimant in *Turpin*, none of the doctors indicate that Angier's subjective complaints are disproportionate to his back or psychological problems. The objective record only lacks specific medical opinions about the effect of his medical issues on his current functioning, which is not sufficient for the ALJ to reject his subjective complaints.

Regarding memory and attention, however, his subjective complaints are not supported by the objective memory tests. Angier testified he had problems remembering things, especially anything more than a short instruction. Filing No. 5-2 at 47, 52. Similarly, he said he had trouble with attention and focus due to his back pain. *Id.* at 49. However, other than one notation by Cusumano, his memory and attention span are reported to be good or normal during the evaluation period. *See* Filing No. 6-1 at 193 (memory grossly intact, attention intact, judgment and insight fair as of October 12, 2020, according to Fernandes); *id.* at 222–24 (good concentration and focus, recent and remote memory intact, insight and judgment good as of November 15, 2021, according to Ramsey); *id.* at 234 (same as of December 27, 2021); Filing No. 6-2 at 4, 6 (concentration and focus good, recent and remote memory intact, good judgment and insight as of April 5, 2022, again according to Ramsey). *But see* Filing No. 6-1 at 185 (immediate memory

impaired in initial consultation with Cusumano in October 2020). Although the lack of objective medical evidence is not enough, on its own, to discount a claimant's subjective complaints, the Court finds this contradiction between medical evidence and subjective complaints about memory and focus justifies finding Angier inconsistent as to his memory and attention span.

However, the balance of the *Polaski* factors still strongly supports Angier's subjective complaints. Although Angier was not given specific functional limitations for the bulk of the evaluation period and although his memory problems are contradicted by the objective medical evidence, his subjective complaints about his back pain and his bipolar disorder are supported by the other six factors. Therefore, there was not substantial evidence for the ALJ to find his complaints inconsistent with the record, particularly regarding the physical effects of his back pain.

### D. Because the Record Is Sufficiently Developed, There is No Need for a Remand for More Fact-Finding

Ordinarily, out of deference to the ALJ, the Court will remand a decision it finds improper to the Administration. *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000). The Court may remand for a calculation of benefits if the "clear weight" of evidence supports a finding of disability and further proceedings "would merely delay receipt of benefits." *Hutsell*, 259 F.3d at 714. This may only be done when the administrative proceedings have already developed the evidence sufficiently for a clear decision to be "unequivocally" made on the record. *Ingram v. Barnhart*, 303 F.3d 890, 895 (8th Cir. 2002). The Court must also remember that even when the sequential evaluation has been carried out through all five steps and the burden of proof shifts to the Commissioner, the burden of persuasion remains with the claimant. *Eichelberger v. Barnhart*, 390 F.3d

584, 592 (8th Cir. 2004). Remand is appropriate if the Commissioner fails to meet his burden of proof in step five due to an improper question asked of a vocational expert. *Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014). Conversely, if questions posed to the vocational expert already establish that the claimant cannot perform other work, it is appropriate to remand for an award of benefits. *Fowler*, 866 F.2d at 253.

Although the Court does not believe the ALJ's decision was supported by substantial evidence, the record in this case is fully developed. Although the ALJ is not obliged to ask the vocational expert about limitations he does not find substantiated, *Perkins*, 648 F.3d at 902, he did so in this case in accordance with his duty to develop the record. Despite finding Cusumano's opinion unpersuasive, the ALJ asked The VE if Angier would be disabled if he missed four or more days of work a month. Filing No. 5-2 at 57. The VE responded that if Angier missed two or more days a month regularly, that would be enough to render him unable to perform competitive employment. *Id.* The Eighth Circuit has also recognized that maintaining employment requires regular attendance. *See Ross*, 218 F.3d at 850 ("In our view, the only residual-functional-capacity assessment that is supported by the record is that Mr. Ross cannot perform any substantial gainful activity, as he cannot maintain the attendance requirements of full time competitive employment.").

The Court, like the ALJ, did not find Cusumano's opinion persuasive. However, Angier testified to the same limitation at the hearing. Filing No. 5-2 at 49 ("I've laid down probably once a week, sometimes twice a week, for almost the entire day, sometimes part of the night."). Inability to rise from a prone position for an entire day would seem to necessitate absence from practically any employment, and as a weekly occurrence, it

41

would require missing at least four days a month.  Angier also testified that depression sometimes made him practically unable to function for an entire day.  *Id.* at 47.  Indeed, Cusumano's opinion attributed Angier's projected attendance problems to a combination of his physical and mental impairments.  Filing No. 6-1 at 400.

Because the Court finds the ALJ improperly discounted Angier's subjective complaints about how his impairments prevented him from functioning with regard to daily attendance, the record already conclusively shows that Angier is disabled if those subjective complaints are properly considered.  Therefore, the Court need not remand for reconsideration of Angier's PTSD or other mental conditions separately from his bipolar disorder.  Rather, the Court reverses the ALJ's decision and remands this case to the Administration for calculation of benefits.

IT IS ORDERED:

1)  Plaintiff's, Kyle Angier's, motion to reverse the Commissioner's decision, Filing No. 8, is granted.

2)  Defendant's, Frank Bisignano's, motion to affirm the Commissioner's decision, Filing No. 10, is denied.

3)  The decision of the Commissioner is reversed;

4)  This action is remanded to the Social Security Administration for an award of benefits; and

5)  A judgment will be entered in conjunction with this Memorandum and Order.

Dated this 8th day of May, 2026.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge